UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LIBERTY MEDIA HOLDINGS, LLC,                   :
                                               :
                            Plaintiff,         :      12 Civ. _____
                                               :
            -against-                          :      COMPLAINT
                                               :
CARY TABORA and SCHULYER WHETSTONE,            :      JURY TRIAL DEMANDED
                                               :
                            Defendants.        :
------------------------------------------------------------------X

## NATURE OF THE ACTION

1. Plaintiff is the sole and exclusive owner of the copyright to an original motion picture, "Corbin Fisher's Down on the Farm" (hereinafter the "Motion Picture"), registered with the United States Copyright Office as copyright number PA 1-698-357.

2. This is a copyright infringement case in which the Defendants were part of a scheme to illegally pirate the Plaintiff's Motion Picture by using advanced internet file-sharing technology called BitTorrent.

3. Plaintiff originally commenced an action in the United States District Court for the Southern District of California under index number 11-CV-651-IEG-JMA, (the "Prior Action") naming Cary Tabora (hereinafter "Tabora") as a defendant. After a period of time in which Tabora effectively evaded service of process, service of process was duly effectuated in New York State. Once Tabora was served with the Complaint, he placed a telephone call to the attorneys then acting as counsel for Plaintiff. During a series of phone calls between Tabora and Plaintiff's prior counsel, Tabora expressly stated that his then-roommate, whom he identified as Schulyer Whetstone (hereinafter "Whetstone"), was the party who illegally downloaded and subsequently distributed the Motion Picture.

1

4. In an attempt to divert liability from himself, Tabora expressly stated that he had full knowledge that Whetstone regularly used Tabora's Internet connection for the criminal purpose of pirating copyrighted content, yet Tabora continued to permit Whetstone to use his Internet connection for this purpose. In fact, Tabora stated emphatically, "I was negligent" in allowing Whetstone to use his Internet connection. Further, Tabora stated that he was aware that Mr. Whetstone was using his Internet connection to illegally pirate content, and that he was aware that it would eventually cause legal problems for him.

5. Subsequent to Tabora's admission, the Prior Action was dismissed for lack of personal jurisdiction over the defendants.

6. Tabora knew of Whetstone's activities, knew that these acts were illegal, admitted that had the right and ability to prevent Whetstone from taking these actions, but declined to exercise that right and ability. In other words, he saw a duty, saw that he breached that duty, and that he knew both of the duty and of the breach.

7. On information and belief, Tabora actively participated in Whetstone's piracy activities. On Tabora's information and Plaintiff's belief, Whetstone and Tabora collaborated and conspired in order to achieve the infringement giving rise to this Complaint.

8. Plaintiff seeks redress for the Defendants' infringement of its exclusive rights in the Motion Picture, for injunctive relief to stop Defendants from continuing to infringe upon Plaintiff's copyrighted works, and for compensation for Tabora's negligence.

## THE PARTIES

9. Plaintiff Liberty Media Holdings LLC ("Plaintiff Liberty") is a California limited liability company with a mailing address of 4262 Blue Diamond Road, Suite 102-377, Las

Vegas, Nevada 89139. Plaintiff Liberty produces high-quality, adult-themed motion pictures, which it sells to adults only.

10. On information and belief, Defendants are individuals, both residing in New York State.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over Plaintiff's claims for copyright infringement and related claims pursuant to 17 U.S.C. §§ 101, et. seq., and 28 U.S.C. §§ 1331 and 1338(a).

12. This Court also has subject matter jurisdiction over Plaintiff's claims because of complete diversity of Plaintiff, a California company, and Defendants, who are New York residents.

13. This Court has personal jurisdiction over Defendants inasmuch as they are residents of New York State, can be found in New York State, and committed the infringement complained of herein from within New York State.

## FACTS COMMON TO ALL CAUSES OF ACTION

14. Defendants used the Internet Protocol ("IP") address 68.175.79.147 on November 16, 2010 at 7:47:02 a.m. (UTC) to illegally republish and illegally distribute copies of the Plaintiff's copyrighted work, "Down on the Farm," to at least 840 other individuals (in the United States) over the Internet using the BitTorrent protocol.

### The BitTorrent Protocol Enables Massively Parallel Copyright Infringement

15. BitTorrent is a file-sharing protocol used for distributing and sharing data on the Internet, including files containing digital versions of motion pictures. A protocol is a type of language that one computer uses to communicate with another computer over a network. Many

protocols allow one computer to download from another computer. One example of such a protocol is HyperText Transfer Protocol, represented by the "http://" before the "www" in a web site address.

16. The BitTorrent protocol, however, is different, and substantially more powerful than HyperText Transfer. Rather than merely allowing the download of a file from a single source, the BitTorrent protocol allows users to join a "swarm," or group, of connected computers to download and upload from each other simultaneously.

17. To participate in a BitTorrent swarm, a user must intentionally download and install a specialized piece of software called a BitTorrent client. The user must then, using a different piece of software – typically a web browser such as Internet Explorer – intentionally visit a BitTorrent tracker website to search from a virtually limitless list of audiovisual works to download. The user then selects the audiovisual work he or she desires and downloads a small BitTorrent tracker file for that work. This tracker file contains the information necessary to locate the other users in the swarm. Then, the user must intentionally direct their BitTorrent client to load and then to execute the tracker file. The BitTorrent client then downloads and uploads to other users until the user possesses a complete copy of the audiovisual file. As the swarm participant downloads and uploads, the BitTorrent client displays a running display of each user in the swarm from whom it is downloading, and to whom it is uploading.

18. As such, joining a swarm and downloading an audiovisual file on BitTorrent is no simple matter. It is a complex procedure requiring conscious deliberation and choice that, by its very nature, cannot be automated or accomplished by accident.

19.     The life cycle of a file shared using BitTorrent begins with just one individual – the initial propagator, sometimes called a "seeder." The initial propagator intentionally elects to share a file with a torrent swarm.

20.     In the instant matter, the original file was a high-quality copy of Plaintiff's entire copyrighted Motion Picture.

21.     Other members of the swarm connect to the seeder to download the file, wherein the download creates an exact digital copy of the file on the downloaders' computers. As additional infringers request the same file, each additional infringer joins the collective swarm, and each new infringer receives the same or different pieces of the file from each other infringer in the swarm who has already downloaded any part of the file.

22.     Files downloaded in this method are received in hundreds or even thousands of individual pieces. Each piece that is downloaded is immediately thereafter made available for distribution to other users seeking the same complete file. The effect of this technology makes every downloader also an uploader of the file. This means that every user who has a copy of the infringing material in a swarm may also be a source for later downloaders of that material.

23.     In the BitTorrent world, there is "honor among thieves." Those who merely download files, without publishing and sharing files, are not called "seeders"; they are derisively called "leechers". Being a leecher is not only a negative due to the pejorative terminology, but leechers are also punished by the torrent swarm. The BitTorrent protocol is designed to automatically stall the downloads of leechers, in an effort to preserve network speed for the more prolific copyright infringers – the seeders.

24.     This distributed nature of BitTorrent leads to a rapid viral sharing of a file throughout the collective peer users. As more peers join the collective swarm, the frequency and

speed of successful downloads also increases. Due to the nature of the BitTorrent protocol, any user is automatically a source for the subsequent user. Every infringer is – by design – simultaneously copying the Plaintiff's copyrighted material and redistributing it.

**Defendants' Were Not Mere Leechers; They were Intentional Seeders**

25.     Plaintiff recorded Tabora's IP address being used to publish and redistribute the Motion Picture via BitTorrent. Therefore, Tabora, Whetstone, or both were not leechers. They were seeders, and they seeded to reap the benefits granted to a seeder. This benefit was not in actual cash, but had substantial pecuniary value: access to volumes upon volumes of infringing copies of pornographic materials. In the online swap meet of pirated motion pictures, sharing is not just caring; sharing is currency.

26.     Whetstone and Tabora were early participants in this swarm. This particular hash file has been traced to at least 840 infringements in the United States alone, which likely spawned thousands more duplicate copies propagated over the Internet. Accordingly, the Defendants' actions were not mere copyright infringement on an individual scale, but were the cause of thousands upon thousands of lost sales and pirated copies of the Plaintiff's work being distributed worldwide.

27.     Each of Plaintiff's works is marked with Plaintiff's trademark (CORBIN FISHER®), a copyright notice, a warning that unauthorized copying is illegal and will be prosecuted, and a statement as required by 18 U.S.C. § 2257 that age verification records for all individuals appearing in the works are maintained at corporate offices in San Diego, California.

**AS AND FOR A FIRST CAUSE OF ACTION**
(Direct Copyright Infringement 17 U.S.C. § 501 against Defendants Jointly and Severally)

28.     Plaintiff repeats and re-alleges the foregoing allegations as though set forth fully herein.

29. Defendants, without authorization or consent, copied and distributed audiovisual works owned by and registered to Plaintiff in violation of 17 U.S.C. §§ 106(1) and (3).

30. Plaintiff is, and at all relevant times has been, the copyright owner of the Motion Picture, "Down on the Farm," registered with the United States Copyright office under registration number PA 1-698-357.

31. Among the exclusive rights granted to Plaintiff under the Copyright Act are the exclusive rights to reproduce the Motion Picture and to distribute it – rights which Defendants maliciously and intentionally infringed upon, and did so for profit.

32. Plaintiff is informed and believes, and on that basis alleges, that Defendant Whetstone, without the permission or consent of Plaintiff, used, and continues to use the BitTorrent file transfer protocol to distribute the Motion Picture to the public, and/or make the Motion Picture available for distribution to others, including other BitTorrent users. In doing so, Defendant has intentionally and willfully violated Plaintiff's exclusive rights of reproduction and distribution. Defendant's actions constitute infringement of Plaintiff's copyrights and exclusive rights under the Copyright Act.

33. In the event that Tabora was not truthful in his admission to former counsel for Plaintiff, then Tabora was the direct infringer. He, without the permission or consent of Plaintiff, used, and continues to use the BitTorrent file transfer protocol to distribute the Motion Picture to the public, and/or make the Motion Picture available for distribution to others, including other BitTorrent users. In doing so, Defendant has intentionally and willfully violated Plaintiff's exclusive rights of reproduction and distribution under the Copyright Act.

34.     The conduct of Defendants is causing and will continue to cause Plaintiff great and irreparable injury. Such harm will continue unless the Defendant is enjoined from such conduct. Plaintiff has no adequate remedy at law.

35.     Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting Defendant from further infringing Plaintiff's copyrights, and ordering Defendant to destroy all copies of the Motion Picture made in violation of Plaintiff's exclusive rights under the Copyright Act.

## AS AND FOR A SECOND CAUSE OF ACTION
(Contributory Copyright Infringement against Defendants Jointly and Severally)

36.     Plaintiff repeats and re-alleges the foregoing allegations as though set forth fully herein.

37.     The Defendants published the Plaintiff's copyrighted motion picture to the BitTorrent network.

38.     The Defendants uploaded files in concert in order to gain access and the ability to download other infringing copyrighted works.

39.     The Defendants knew of the infringement, knew of their own infringement, knew that multiple other user were downloading the file containing the Plaintiff's Motion Picture, and knew that they would, in turn, redistribute that file.

40.     The infringement by other BitTorrent users could not have occurred but for the Defendant's participation in uploading the Plaintiff's protected work. As such, the Defendants' participation in the infringing activities of others is substantial, was certain to harm the Plaintiff, and continues to this day.

41. The Defendants each profited from this contributory infringement by way of being granted access to a greater library of other infringing works, some of which belonged to the Plaintiff and some of which belonged to other copyright owners.

42. In the event that Tabora's attempt to blame Whetstone for the infringement was based in truth, Tabora profited from this contributory infringement by granting Whetstone access to his Internet connection for (on information and belief) profit either in the form of goodwill, barter, or a contribution to the bill for the Internet connection.

43. Tabora had the right and ability to control Whetstone's access to the Internet connection and declined to exercise that right and ability in order to stop Whetstone's activities, even though he was fully aware of the fact that Whetstone used the Internet connection regularly to infringe upon the Plaintiff's copyrights and the copyrights of other parties.

44. Tabora knew of the infringement, was conscious of Whetstone's infringing activities, and the infringement by Whetstone and other BitTorrent users could not have occurred but for Tabora's contribution to the scheme and his profit therefrom.

45. Furthermore, the Defendants had the right and ability to prevent other members of the Torrent swarm from downloading the Motion Picture from Tabora's computer: Whetstone could have chosen to be a mere leecher, but instead made himself a seeder; Tabora could have refused to allow Whetstone to use his internet connection when he knew that Tabora was using it to download copyrighted works. Whetstone either failed or refused to exercise this right and ability to control this access because allowing greater access to his library of pirated works gave him greater access to others' libraries of pirated works. Tabora chose not to exercise this right and ability because, on information and belief, Whetstone paid for half of the monthly internet access charge.

46. As such, Defendant Tabora is liable for the immediate contributory infringement of his roommate, Whetstone. Whetstone and Tabora are both liable for the infringement of all members of the torrent swarm who came after Whetstone.

### AS AND FOR A THIRD CAUSE OF ACTION
(Negligence against Defendant Tabora)

47. Plaintiff repeats and re-alleges the foregoing allegations as though set forth fully herein.

48. In the event that Tabora has been truthful, that the only direct infringer is Mr. Whetstone, then Tabora was negligent and his negligence caused actual damages to the Plaintiff.

49. Defendant Tabora's negligent actions allowed Whetstone and others to unlawfully copy and distribute Plaintiff's copyrighted Motion Picture, proximately causing financial harm to Plaintiff.

50. Tabora was aware that Whetstone used Tabora's Internet connection to copy and redistribute the Plaintiff's intellectual property without authorization. In doing so, Tabora negligently caused harm to the Plaintiff in the form of lost sales and reputational damage.

51. Defendant Tabora admitted that he not only was aware of Whetstone's criminal activity, but that he informed Whetstone of the likelihood that Defendants might be caught and suffer legal consequences if Whetstone continued his unlawful actions while using Tabora's Internet connection.

52. At one point, according to Tabora, Tabora informed Whetstone that if Whetstone continued his illegal activities, then it would be appropriate for Whetstone to become the party responsible for the Internet connection. If true, this shows that Tabora was well aware of the fact that Whetstone was committing a legal harm.

53. Despite Tabora's full knowledge of Whetstone's activity and the illegal nature thereof, Tabora continued to allow Whetstone to access Tabora's Internet connection.

54. Internet subscribers have a duty to prevent others from using their own Internet connections for illegal purposes. This duty is heightened when the subscriber has actual knowledge that others are using their connection for illegal purposes. It is heightened still further when the illegal purpose is a federal crime, as was Tabora's willful copyright infringement.

55. Once Tabora learned that Whetstone was using his Internet connection for the wholesale, unlicensed and willful distribution of the Plaintiff's works, Tabora had a specific and heightened duty to prevent Whetstone from using his Internet connection for this illegal and criminal purpose.

56. This heightened duty was higher still since, on information and belief, Tabora had actual knowledge that Whetstone was causing damage to the Plaintiff.

57. Tabora's breach of his duty caused the Plaintiff to incur damages. Had Tabora stopped allowing Whetstone to use his Internet connection for illegal purposes, the Plaintiff would not have lost sales. As a result of Tabora's negligence, the Plaintiff lost at least 840 total sales, at the rate of at least $60 per sale.

58. Tabora's failure to adhere to his duty was the "but-for" and proximate cause of actual damages to the Plaintiff.

**WHEREFORE**, Plaintiff demands judgment as follows:

(i) on Plaintiff Liberty's First Cause of Action, an amount to be determined at trial, but in no event less than the statutory amount of $150,000 and an injunction providing that Defendants shall be enjoined from directly or indirectly infringing upon the Plaintiff's copyrights

in the Motion Picture or any other works, whether now in existence or later created, that are owned or controlled by Plaintiff (or any parent, subsidiary, or affiliate of Plaintiff), including without limitation by using the Internet or any online media distribution system to reproduce (i.e., download) any of Plaintiff's works, to distribute (i.e., upload) any of Plaintiff's works, or to make any of Plaintiff's works available for distribution to the public, except pursuant to a lawful license or with the Plaintiff's express consent. Defendants also shall destroy all copies of Plaintiff's works that Defendants have downloaded onto any computer hard drive or server and shall destroy all copies of those downloaded works transferred onto any physical medium or device in Defendants' possession, custody, or control.

(ii)    on Plaintiff Liberty's Second Cause of Action, an amount to be determined at trial, but in no event less than the statutory amount of $150,000;

(iii)   on Plaintiff Liberty's Third Cause of Action, an amount to be determined at trial, but in no event less than $50,400.

(iv)    punitive damages, together with costs and disbursements of this action, including attorneys' fees; and

(v)     further relief as this Court deems just and proper.

Dated: New York, New York
       March 21, 2012

NESENOFF & MILTENBERG, LLP

By: _____
Andrew T. Miltenberg, Esq. (AM 7006)
Marco A. Santori, Esq. (MS 7422)
Attorneys for Plaintiff Liberty

363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500

amiltenberg@nmllplaw.com
msantori@nmllplaw.com