**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIBERTY MEDIA HOLDINGS, LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) | ECF Case |
| v. ) | |
| ) | Case No. 1:12-cv-02234-LAK |
| CARY TABORA and ) | |
| SCHUYLER WHETSTONE ) | |
| ) | |
| Defendants. ) | |
| ) | |

**BRIEF AMICUS CURIAE OF THE ELECTRONIC FRONTIER FOUNDATION**
**IN PARTIAL SUPPORT OF DEFENDANT CARY TABORA'S**
**MOTION TO DISMISS**

Ray Beckerman
RAY BECKERMAN, P.C.
ATTORNEYS AT LAW
108-18 Queens Blvd. (4th Fl.)
Forest Hills, NY 11375
Phone (718) 544-3434
Fax (718) 559-6584
ray@beckermanlegal.com

Mitchell L. Stoltz (*Pro Hac Vice* pending)
Matthew Zimmerman
Corynne McSherry
ELECTRONIC FRONTIER
FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Tel: (415) 436-9333
Email: mitch@eff.org
*Attorneys for Amicus Curiae*
*Electronic Frontier Foundation*

# TABLE OF CONTENTS

INTEREST OF AMICUS .................................................................................................1

INTRODUCTION ..........................................................................................................1

ARGUMENT ...................................................................................................................3

I.   Secondary Copyright Liability Cannot and Should Not Be Based on Mere Negligence..3

    A.   Creating a New Form of Copyright Liability Would Upend the Copyright Balance and Impede Innovation......................................................................3

    B.   Creating a New Form of Copyright Liability Would Contravene Congressional Intent. ...................................................................................5

II.   Federal Copyright Claims Disguised As State Negligence Claims Are Preempted. .......7

III.   No Duty To Police The Use Of An Internet Connection Exists, And Such A Duty Would Interfere With Important Public Policies And Widespread Practice.................11

CONCLUSION...............................................................................................................15

# TABLE OF AUTHORITIES

## Federal Cases

*Aetna Health Inc. v. Davila*,
   542 U.S. 200, 124 S. Ct. 2488 (2004) ........................................................ 8

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
   650 F.3d 876 (2d Cir. 2011) .................................................................... 7

*Beadleston v. Am. Tissue Corp.*,
   839 N.Y.S.2d 283, 41 A.D.3d 1074 (2007) ............................................. 4

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004) .................................................................... 8

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363, 120 S. Ct. 2288 (2000) ................................................. 2, 10

*Dielsi v. Falk*,
   916 F. Supp. 985 (C.D. Cal. 1996) ......................................................... 9

*Einhorn v. Seeley*,
   525 N.Y.S.2d 212, 136 A.D.2d 122 (1988) ....................................... 11, 12

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ................................................................ 6

*Fay v. Assignment Am.*,
   666 N.Y.S.2d 304, 245 A.D.2d 783 (Sup. Ct. App. Div. 1997) .............. 12

*Felix the Cat Productions Inc. v. New Line Cinema*,
   No. 99-cv-9339 FMC (RCx), 2000 WL 770481 (C.D. Cal. Apr. 28, 2000) ........... 8, 9

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d Cir. 1971) .............................................................. 3, 9

*Grimaldi v. Manhattan Arms Hotel, Inc.*,
   833 N.Y.S.2d 97, 39 A.D.3d 298 (2007) ............................................... 12

*Hines v. Davidowitz*,
   312 U.S. 52, 61 S. Ct. 399 (1941) ..................................................... 2, 10

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ................................................................ 9

*Lontz v. Tharp*,
    413 F.3d 435 (4th Cir. 2005) .................................................................. 10

*Marvullo v. Gruner & Jahr AG & Co.*,
    No. 98-cv-5000 (RLC), 2001 WL 40772 (S.D.N.Y. Jan. 17, 2001)....................9, 10

*Mayer v. Josiah Wedgwood & Sons, Ltd.*,
    601 F. Supp. 1523 (S.D.N.Y. 1985) ........................................................7, 8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913, 125 S. Ct. 2764 (2005)..............................................3, 4, 5

*Palka v. Servicemaster Mgmt. Services Corp.*,
    83 N.Y.2d 579, 634 N.E.2d 189 (Ct. App. 1994) ...................................11

*Pavlica v. Behr*,
    397 F. Supp. 2d 519 (S.D.N.Y. 2005) ....................................................8

*Perfect 10, Inc. v. CCBill, LLC*,
    488 F.3d 1102 (9th Cir. 2007) ................................................................6

*Rosciszewski v. Arete Associates*,
    1 F.3d 225 (4th Cir. 1993) ...................................................................10

*Sony Corp. v. Universal City Studios*,
    464 U.S. 417, 104 S. Ct. 774 (1984) .....................................................3

*The T.J. Hooper*,
    60 F.2d 737 (2d Cir. 1932) ....................................................................12

*WNET v. Aereo, Inc.*,
    Case No. 12-cv-1543 (AJN), 2012 WL 1850911 (S.D.N.Y. May 18, 2012) .............9

## Federal Statutes

17 U.S.C. § 301 ...........................................................................................7, 8, 10

17 U.S.C. § 512 ...............................................................................................6, 7

## Federal Rule

Fed. R. Civ. P. 11 ...............................................................................................2

**Legislative Materials**

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 ...............................10

S. Rep. No. 105-190 (1998) ......................................................................................6

## INTEREST OF AMICUS

The Electronic Frontier Foundation (EFF) is a member-supported, nonprofit public interest organization dedicated to protecting civil liberties and free expression in the digital world. Founded in 1990, EFF represents more than 19,000 contributing members. EFF's mission is to ensure that the civil liberties and due process guaranteed by our Constitution and laws do not diminish as communication, commerce, government, and much of daily life move online. EFF has contributed its expertise to many cases regarding copyright law and the Internet, as *amicus curiae*, as party counsel, and as court-appointed attorneys *ad litem*.

## INTRODUCTION

*Amicus curiae* the Electronic Frontier Foundation (EFF) files this brief in support of Defendant Cary Tabora's Rule 12(b)(6) motion to dismiss Plaintiff Liberty Media Holdings LLC's ("LMH's") third cause of action, a negligence claim. Dkt. Nos. 14, 17. EFF submits this brief because it is deeply concerned that LMH's negligence theory of liability, if accepted, would open a chasm of legal risk for unsuspecting wireless Internet ("Wi-Fi") providers. LMH's allegations against Mr. Tabora, taken as true, boil down to this: Mr. Tabora provided Internet access to Mr. Whetstone in return for a share of the monthly fee,[1] and Mr. Tabora knew generally that Mr. Whetstone made infringing downloads using that Internet access.[2] On that basis LMH claims, *inter alia*, that Tabora is guilty of negligence; *i.e.,* he negligently allowed Whetstone to infringe LMH's copyright. [3]

LMH's theory of liability cannot withstand even passing scrutiny. No matter how artfully pled, LMH's claim sounds in, and is preempted by, copyright law. And as decades

---

[1] Compl. ¶¶ 42, 45.
[2] Compl. ¶¶ 4, 39, 44, 51-53.
[3] *Amicus* expresses no opinion as to whether Mr. Tabora can be found liable under legitimate theories of direct or secondary copyright liability.

of copyright jurisprudence and legislation make clear, that body of law does not recognize a cause of action based on mere negligence. Accordingly, no court has ever found, or could ever find, that anyone has violated copyright law simply because another user of his or her Internet connection did so.[4]

And that is a good thing. Every day cafes, airports, libraries, laundromats, schools and individuals operate "open" Wi-Fi routers, sharing their connection with neighbors and passers-by at no charge. Sometimes people use those connections for bad acts. Most of the time they don't, and the world gets a valuable public service of simple, ubiquitous Internet access.

Creating a duty under tort law to prevent others from infringing copyright would drastically inhibit this activity, to the detriment of the general public and clear federal copyright and telecommunications policies promoting convenient, universal access to the Internet. Thus, manufacturing a new copyright cause of action based on negligence – which, make no mistake, is precisely what LMH asks the Court to do – would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[5]

LMH's negligence claim should be promptly dismissed.

---

[4] Indeed, we believe that an appropriate response to the Complaint would be a motion under Fed. R. Civ. P. 11.

[5] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2296 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399 (1941)).

## ARGUMENT

**I.   Secondary Copyright Liability Cannot and Should Not Be Based on Mere Negligence.**

### A.   *Creating a New Form of Copyright Liability Would Upend the Copyright Balance and Impede Innovation.*

Copyright law promotes "a sound balance between the respective values of supporting creative pursuits through copyright protection and promoting innovation in new communication technologies by limiting the incidence of liability for copyright infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928, 125 S. Ct. 2764, 2775 (2005). Thus, "the administration of copyright law is an exercise in managing the tradeoff" between artistic protection and technological innovation, and is "mindful of the need to keep from trenching on regular commerce . . . ." *Id.* at 937.

Secondary copyright liability embodies that careful balance by ensuring that the standard for such liability remains high. Copyright law recognizes only two forms of secondary copyright liability: vicarious and contributory (which includes inducement). Vicarious liability requires proof that the defendant profited from the infringement and had the right and ability to control it. Contributory liability requires proof that the defendant, with "knowledge of the infringing activity, induce[d], cause[d] or materially contribute[d] to the infringing conduct of another." *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). "These doctrines of secondary liability emerged from common law principles and are well established in the law." *Grokster*, 545 U.S. at 930, 125 S. Ct. at 2776 (citing *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 486, 104 S. Ct. 774, 811 (1984) (Blackmun, J., dissenting)).

In both cases, secondary liability turns on specific intentional acts. In *Sony*, there was no evidence that the defendant had done anything to encourage infringement; in

*Grokster*, by contrast, the Court determined that such evidence existed, and found liability on that basis. There is no question that "mere knowledge of infringing potential or of actual infringing uses would not be enough [] to subject a distributor to liability." *Grokster*, 545 U.S. at 937, 125 S. Ct. at 2780.

Negligence, by contrast, can turn on a mere failure to take reasonable care. *Beadleston v. Am. Tissue Corp.*, 839 N.Y.S.2d 283, 286, 41 A.D.3d 1074, 1076 (2007). No court has ever accepted such a low standard for copyright liability, nor should it. Such a dramatic expansion in secondary liability, and the legal uncertainty it would engender, would have ramifications far beyond this case. If a party could be subject to copyright damages solely because it did not do enough to prevent it, any number of innovative companies could be subject to liability. Indeed, on that theory, Sony could have been held liable for manufacturing and selling the videocassette recorder, a device that was capable of infringing as well as non-infringing uses.

In particular, basing copyright liability on mere negligence would have a chilling effect on the growth of publicly available wireless networks. As of this year, 111,205 public Wi-Fi locations are active in the United States, operated by municipalities, institutions, private businesses, and others.[6] One report cited by the Federal Communications Commission ("FCC") estimated that 415 cities and counties in the U.S. have engaged in "deploying, planning, or running Wi-Fi networks."[7] Just this month, *The New York Times* reported that "[h]alf of the busiest airports in the United States now have free Wi-Fi,

---

[6] *JiWire*, Mobile Audience Insights Report Q1 (2012), *available at* http://www.jiwire.com/insights ("JiWire Report").

[7] In the Matter of Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in A Reasonable & Timely Fashion, & Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, 23 FCC Rcd. 9615, 9622 (2008).

including Denver, Las Vegas, San Francisco, Phoenix and Houston," adding that the Denver International Airport provides free Wi-Fi access to 10,000 users daily.[8] Businesses ranging from McDonald's (at 11,500 locations)[9] to Starbucks likewise offer free Wi-Fi service to customers.[10] In the first quarter of 2012, 77.1 percent of public Wi-Fi locations in the U.S. provided no-cost access.[11]

The negligence standard LMH proposes would put all of this at risk. Service providers could suddenly be subject to legal threat if they failed to take reasonable care to prevent infringing activities – and it is not at all clear what constitutes reasonable care. By the logic of LMH's complaint, reasonable care could be interpreted to require monitoring the online activities of everyone who uses one's Internet connection – an expensive and intrusive proposition. Thus, LMH asks this Court to do precisely what the Supreme Court has counseled against: reset the balance between artistic protection and innovation in a way that is likely to impede legitimate commerce. *See, e.g.,Grokster*, 545 U.S. at 937, 125 S. Ct. at 2780 ("The inducement rule . . . premises liability on purposeful, culpable expression and conduct, and thus *does nothing to compromise legitimate commerce or discourage innovation having a lawful purpose*.") (emphasis added).

**B.  *Creating a New Form of Copyright Liability Would Contravene Congressional Intent.***

Moreover, LMH's theory runs contrary to the spirit and intent of the Digital Millennium Copyright Act of 1998. In order to galvanize and protect online expression and

---

[8] Susan Stellin, *Free Wi-Fi, but Speed Costs*, N.Y. Times, June 4, 2012, http://www.nytimes.com/2012/06/05/business/airports-and-hotels-look-at-tiered-pricing-for-internet-access.html.

[9] *Free Wi-Fi @ McDonald's*, http://www.mcdonalds.com/us/en/services/free_wifi.html (last visited June 12, 2012).

[10] *Wi-Fi (United States)*, http://www.starbucks.com/coffeehouse/wireless-internet (last visited June 12, 2012).

[11] JiWire Report.

commerce, Congress crafted a set of safe harbors from copyright liability to "provide 'greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'" *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (citing S. Rep. No. 105-190, at 20 (1998)). Congress found that "service providers must make innumerable electronic copies by simply transmitting information over the Internet," and that some information transmitted at a user's request "might contain infringing material." S. Rep. No. 105-190, at 8. Congress concluded that "by limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." *Id.*

A "service provider" is defined to include "an entity . . . providing of connections for digital online communications." 17 U.S.C. § 512(k)(1) (2006). The definition of a service provider is broad, and includes those who do not operate communications equipment themselves. In *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1115-16 (9th Cir. 2007), for example, the court held that a payment processor for online content was a "service provider" entitled to the protection of Section 512(a) despite not operating the alleged infringer's Internet connection or transmitting any infringing material. Congress also intended that the term cover "subcontractors" of Internet service providers. *See* H.R. Rep. No. 105-551(II), at 50. Arguably, this definition covers the providers of open Wi-Fi discussed above, such as municipalities, cafes and libraries.

The statute also clarifies the outer limits of a service provider's obligations – perhaps most importantly, by making it clear that a service provider need not monitor its service or affirmatively seek facts indicating infringing activity in order to enjoy the safe harbor. *See*

17 U.S.C. § 512(m)(1) (2006). A negligence standard for copyright liability – a duty to prevent infringement when one has general knowledge it is occurring using equipment one has helped to provide – cannot be squared with the DMCA's specific statement that service providers do not have a duty to investigate their users' activities.

Thus, to the extent that Congress *has* spoken regarding secondary copyright liability, it has stressed the importance of establishing legal certainty, in order to ensure that copyright law does not unduly interfere with the development of online commerce and expression. Creating a new, lower standard for liability would do just the opposite.

## II.  Federal Copyright Claims Disguised As State Negligence Claims Are Preempted.

LMH seeks to avoid the clear limits of copyright law by recasting its allegation of copyright infringement as a state tort claim. Section 301 of the Copyright Act does not countenance this attempt at artful pleading. Specifically, Section 301 provides that:

> all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State

17 U.S.C. § 301(a) (2006). Thus, a state law claim is preempted when (1) "the work is the type of work protected by the copyright laws; [and (2)] the right asserted is equivalent to a right protected by federal copyright law." *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1531 (S.D.N.Y. 1985); *see Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 909 (2d Cir. 2011) (quoting *Mayer*, 601 F. Supp. at 1535).

"To determine whether a claim is qualitatively different, we look at what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the

rights sought to be enforced." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (internal quotation marks omitted). The work at issue here is "an original motion picture, " which LMH alleges to be the subject of a copyright registration. Compl. ¶ 1. This is unquestionably a "type of work protected by the copyright laws." *See Felix the Cat Productions Inc. v. New Line Cinema*, No. CV-99-9339 FMC (RCx), 2000 WL 770481, at *5 (C.D. Cal. Apr. 28, 2000) ("It is clear that the work 'at issue' [a clip from a television cartoon] is within the subject matter of copyright law."); *Pavlica v. Behr*, 397 F. Supp. 2d 519, 530 (S.D.N.Y. 2005) ("The subject matter of Pavlica's state law tortious interference [a teacher's manual] falls squarely within the subject matter of the copyright laws.").

The second part of the test, whether the right asserted is "equivalent" to a right protected by copyright, is often characterized as an "extra element" test – whether the state claim includes elements that differ from those of a copyright claim. *Mayer*, 601 F. Supp. at 1523. An extra element sufficient to survive preemption "must be one which changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim. Elements such as awareness or intent, which alter the action's scope but not its nature, will not save it from preemption under § 301." *Id.* at 1535; *see also Briarpatch Ltd.,* 373 F.3d at 306 (applying "a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim.") (internal quotation marks and citations omitted). This qualitative test heeds the Supreme Court's warning against "distinguishing between pre-empted and non-pre-empted claims based on the particular label affixed to them." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 201, 124 S. Ct. 2488, 2491 (2004). State claims that merely restate a copyright infringement claim, regardless of how they are pled, are preempted. *Marvullo v. Gruner & Jahr AG & Co.*, No.

98-cv-5000 (RLC), 2001 WL 40772, at *7 (S.D.N.Y. Jan. 17, 2001); *Litchfield v. Spielberg*,

736 F.2d 1352, 1358 (9th Cir. 1984) ("In so far as these state claims are restatements of the

copyright infringement claims, they are preempted by federal copyright law.").

     No such extra element is present here. LMH apparently hopes to avoid preemption

based on its allegation that Mr. Tabora knew of Mr. Whetstone's infringement. That is not

enough. The claim remains founded on the alleged copying and distribution of LMH's

copyrighted film. Compl. ¶ 14 ("illegally republish and illegally redistribute"). Further,

contributory copyright infringement includes a knowledge element. *Gershwin*, 443 F.2d at

1162. Mr. Tabora's alleged knowledge is therefore not an "extra element" that would

distinguish LMH's negligence claim from its copyright claim in any legally cognizable way.

     Indeed, negligence and other state law claims predicated on the unauthorized

reproduction or distribution of creative works are routinely held to be preempted. *Marvullo*,

2001 WL 40772, at *7 ("[P]laintiff's negligence claim restates his copyright infringement

claim and is preempted."); *Felix the Cat Prods.*, 2000 WL 770481, at *5

("[R]echaracterizing plaintiff's copyright claim as one for negligence does not add an

additional element."); *Dielsi v. Falk*, 916 F. Supp. 985, 992 (C.D. Cal. 1996)

("[R]echaracterization of the claim as one of 'negligence' does not add a legally cognizable

additional element because a general claim for copyright infringement is fundamentally one

founded on strict liability."); *WNET v. Aereo, Inc.*, No. 12 Civ. 1543(AJN), 2012 WL

1850911, at *10 (S.D.N.Y. May 18, 2012) (rejecting "Plaintiffs' position . . . that state law

may broaden the effective reach of the copyright protection").

     *Marvullo v. Gruner & Jahr AG & Co.* is illustrative. In that case, the owner of

copyright in a photograph sued a German magazine's U.S. distributor for, *inter alia*,

secondary copyright infringement and negligence for distributing a magazine issue that used the plaintiff's photographs beyond the scope of the plaintiff's license to the publisher. 2001 WL 40772, at *1. In effect, the plaintiff accused the distributor of abetting the publisher in an unauthorized distribution of the photos. The court upheld the copyright infringement claim, finding that the complaint contained the knowledge and material contribution elements of contributory infringement. *Id.* at *3. However, the court dismissed a negligence claim predicated on the same facts as preempted, because the "essential allegation remain[ed] that defendants unlawfully used the McNeely and White House photographs beyond the scope of the license" – in other words, a copyright infringement, and not a state tort. *Id.* at *7.

Moreover, preemption is required where, as here, "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373, 120 S. Ct. at 2294 (quoting *Hines*, 312 U.S. at 67, 61 S. Ct. at 404). Allowing LMH's negligence claim to proceed would conflict with "the statutory test's insistence on exclusive, uniform national regulation of copyright." *Lontz v. Tharp*, 413 F.3d 435, 441 (4th Cir. 2005). As noted in the legislative history of Section 301:

> The declaration . . . in section 301 is intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection.

H.R. Rep. No. 94-1476, at 130 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5746 (quoted in *Rosciszewski v. Arete Associates,* 1 F.3d 225, 232 (4th Cir. 1993)).

By creating a shortcut to liability that bypasses and undermines copyright's traditional framework, LMH's theory of liability would inevitably lead to the "vague borderline area" Congress sought to avoid. That theory must be rejected.

### III.    No Duty To Police The Use Of An Internet Connection Exists, And Such A Duty Would Interfere With Important Public Policies And Widespread Practice.

Even if it were not preempted, which it certainly is, LMH's negligence claim does not hold water under New York law. The Court should also dismiss that claim because creating a legal duty to prevent others from infringing copyright using one's Internet connection exists would impede law-abiding citizens' access to the Internet, a national and local priority.

Under New York law, liability in tort exists only when the defendant owes a legal duty to the plaintiff. The existence or nonexistence of such a duty is a question of law. *See Palka v. Servicemaster Mgmt. Services Corp.*, 83 N.Y.2d 579, 585, 634 N.E.2d 189, 192 (Ct. App. 1994). There is "no duty thrust on a defendant to prevent a third party from causing harm to another," except in special cases "where a special relationship exists between the defendant and the third person so as to give rise to a duty to control," or "when a special relationship exists between the defendant and the victim which gives the latter the right to protection." *Einhorn v. Seeley*, 525 N.Y.S.2d 212, 215, 136 A.D.2d 122, 126 (1988). Such special relationships include "employers-employees, owners and occupiers of premises, common carriers and their patrons, and hosts who serve alcoholic beverages to their guests." *Id.*

Contrary to LMH's allegations, Compl. ¶¶ 54-56, New York law does not recognize a special relationship between a provider of Internet service and a user of that service. This is, rather, an ordinary business relationship. *See Fay v. Assignment Am.*, 666 N.Y.S.2d 304,

11

306, 245 A.D.2d 783, 784 (Sup. Ct. App. Div. 1997) (nurse owed no duty to respiratory technician to prevent patient from injuring technician). Mr. Tabora allegedly acted as a service provider for Mr. Whetstone. Neither that nor LMH's allegation that Mr. Tabora had a "right and ability to control Whetstone's access to the Internet connection," Compl. ¶ 43, gives rise to a special relationship. "[T]he mere fact that the defendant could have exercised control 'as a practical matter' does not create a duty to do so." *Fay*, 666 N.Y.S.2d at 306, 245 A.D.2d at 784.

Even assuming *arguendo* that Mr. Tabora was in a special position *vis-a-vis* Mr. Whetstone by virtue of sharing his Internet connection, that position creates no "corresponding duty of care to members of the public at large," such as to LMH. *Grimaldi v. Manhattan Arms Hotel, Inc.*, 833 N.Y.S.2d 97, 98-99, 39 A.D.3d 298, 299 (2007) (hotel owner owed no duty of care to passerby to prevent guest from dropping an air conditioner from a window, notwithstanding hotel's knowledge that guest wanted the air conditioner removed).[12]

Moreover, the legal duty between two people – even those in a business relationship – is limited by countervailing public policies. *Einhorn*, 525 N.Y.S.2d at 215, 136 A.D.2d at 127 ("[L]iability of the landlord who has a direct relationship with the tenant, even as compared with defendant locksmith, has itself been seriously limited, as a matter of public policy."). Declaring a provider of Internet service such as Mr. Tabora to be in a "special relationship" with users of the service, such as Mr. Whetstone, would conflict with

---

[12] LMH's counsel has asserted in public statements that the case of *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932) is applicable to this case. It is not. The plaintiff in that case was a cargo owner who sued a shipper for negligence in the loss of the cargo. Unlike the plaintiff in *T.J. Hooper*, LMH has no business relationship at all with Mr. Tabora, let alone a contractual duty to safeguard specific property.

the firmly established public policy of promoting Internet access by, as explained in Part I,

*supra*, creating new and chilling legal uncertainty.

Indeed, elected officials and public servants at all levels of government have spoken

out on the benefits of public wireless Internet access. In remarks at the Department of

Commerce in 2004, President George W. Bush offered one such example:

> Spokane, Washington, yesterday established a wi-fi hot zone that allows
> users within a hundred-block area of the city to obtain wireless broadband
> access. Imagine if you're the head of a chamber of commerce of a city, and
> you say, "Gosh, our city is a great place to do business or to find work.
> We're setting up a wi-fi hot zone, which means our citizens are more likely
> to be more productive than the citizens from a neighboring community." It's
> a great opportunity.[13]

The Federal Trade Commission has likewise reported that municipal wireless systems "are

often less expensive to deploy than traditional fiber optic or cable wireline networks."[14] And

in a press interview about these networks, Federal Communications Commissioner Michael

Copps stated that he "think[s] anybody getting broadband to the inner-city and to all

segments of the population is performing a public service."[15]

The benefits of open wireless Internet access extend to national security. As the FCC

has reported, "Wi-Fi networks are demonstrating their importance in homeland security

measures," specifically noting that "the Minneapolis Wi-Fi network aided rescue workers

---

[13] George W. Bush, *Remarks on Innovation at the U.S. Department of Commerce*, Washington, D.C. (June 24, 2004) (transcript available at http://www.gpo.gov/fdsys/pkg/WCPD-2004-06-28/html/WCPD-2004-06-28-Pg1144.htm).
[14] FTC Staff, *Municipal Provision of Wireless Internet* (Sept. 2006), available at http://www.ftc.gov/os/2006/10/V060021municipalprovwirelessinternet.pdf.
[15] Jim Hu, *Newsmaker: Why our Broadband Policy's Still a Mess*, CNET News (Feb. 28, 2005, 7:00 AM), http://news.cnet.com/Why-our-broadband-policys-still-a-mess/2008-1034_3-5590929.html.

following the collapse of the I-35 bridge."[16] The Department of Homeland Security even funded a Wi-Fi network along Interstate 19 in Arizona, designed primarily for emergency services and the Border Patrol, but intending to later provide access to community services and residents.[17] Such security tools would be undermined by the creation of a new duty on providers to police wireless networks for illegality.

The public benefits of open wireless Internet access have also been expressed at the municipal level. Indianapolis Mayor Bart Peterson called his city's Wi-Fi network "a beneficial economic development tool" that can "enhance tourism in our great city."[18] Cleveland City Councilman Kevin J. Kelley, commenting on the development of open wireless access in his ward, stated that the effort "is about giving our children an advantage; it is about providing opportunity to every resident in this ward."[19] And Dennis Newman, the Chief Information Officer of Winston-Salem, North Carolina, similarly explained that the city's municipal wireless has "made downtown appealing to those who want to come and sit at a coffee table or outside."[20]

---

[16] In the Matter of Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in A Reasonable & Timely Fashion, & Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, 23 FCC Rcd. 9615, 9652 n.36 (2008).

[17] Patrick Norton, *VOIP at 80 MPH: World's First Wi-Fi Highway*, ExtremeTech (Feb. 23, 2005, 5:10 PM), http://www.extremetech.com/extreme/74530-voip-at-80-mph-worlds-first-wifi-highway.

[18] *Indianapolis' Fountain Square District – Largest Free Wi-Fi Zone in Indiana*, Mobile Dev & Design (July 24, 2007, 2:29 PM),
http://mobiledevdesign.com/hardware_news/wifi_in_indiana_0724/.

[19] Esme Vos, *Cleveland, Ohio Neighborhood Deploys Large Outdoor Free Wi-Fi Network*, MuniWireless (Nov. 10, 2011), http://www.muniwireless.com/2011/11/10/cleveland-ohio-neighborhood-deploys-large-outdoor-free-wi-fi-network/.

[20] Joe DePriest, *Newton Hopes Free Wi-Fi Enlivens Downtown*, Charlotte Observer, Sept. 25, 2011, http://www.charlotteobserver.com/2011/09/25/2637701/newton-hopes-free-wi-fi-enlivens.html.

By imposing a duty on wireless network providers to police their networks, LMH's negligence theory would inevitably jeopardize the future expansion of this beneficial service. For this separate reason, EFF urges the Court to reject LMH's approach.

## CONCLUSION

In LMH's own words, "this is a copyright infringement case." Compl. ¶ 2. Copyright law already provides a framework for determining secondary infringement liability. As such, LMH's negligence claim is preempted. Moreover, imposing a police duty on those who merely provide Internet access would have dangerous consequences far beyond this case. For these reasons, EFF respectfully urges the Court to dismiss LMH's negligence claim.

Dated: June 15, 2012

By: /s/ Ray Beckerman
    Ray Beckerman
    RAY BECKERMAN, P.C.
    ATTORNEYS AT LAW
    108-18 Queens Blvd. (4th Fl.)
    Forest Hills, NY 11375
    Phone (718) 544-3434
    Fax (718) 559-6584
    ray@beckermanlegal.com

    Mitchell L. Stoltz (*Pro Hac Vice* pending)
    Matthew Zimmerman
    Corynne McSherry
    ELECTRONIC FRONTIER FOUNDATION
    454 Shotwell Street
    San Francisco, CA 94110
    Tel: (415) 436-9333
    Fax: (415) 436-9993
    Email: mitch@eff.org
    *Attorneys for Amicus Curiae*
    *Electronic Frontier Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2012, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court, Southern District of New York by

using the CM/ECF system. I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the CM/ECF system.

Dated: June 27, 2012

By: /s/ Mitchell L. Stoltz
        Mitchell L. Stoltz (*Pro Hac Vice*)
        ELECTRONIC FRONTIER
        FOUNDATION
        454 Shotwell Street
        San Francisco, CA 94110
        Tel: (415) 436-9333
        Fax: (415) 436-9993
        Email: mitch@eff.org